# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**BURTON W. WIAND, AS RECEIVER FOR HOWARD WAXENBERG TRADING L.L.C., HKW TRADING LLC, and HKW TRADING FUND I LLC,**

        **Plaintiffs,**

vs.                               **Case No. 8:05-CV-1856-T-27TBM**

**ZELDA J. WAXENBERG, individually and as Trustee of the ZELDA WAXENBERG FAMILY TRUST,**

        **Defendant.**

_____/

## ORDER

**BEFORE THE COURT** are: (1) Defendant's Motion for Summary Judgment (Dkt. 139), to which the Receiver has responded in opposition (Dkt. 147); (2) the Receiver's Motion for Summary Judgment (Dkt. 142), to which the Defendant has responded in opposition (Dkt. 149); (3) Defendant's Motion in Limine to Exclude the Expert Opinion Testimony and Report of Expert Witness Stephen S. Oscher and Oscher Consulting, P.A. (Dkt. 141), to which the Receiver has responded in opposition (Dkt. 150); and (4) the Receiver's Motion to Strike the Expert Report and Testimony of Lloyd Morgenstern (Dkt. 143), to which Defendant has responded in opposition (Dkts. 146, 164). Defendant's motion for summary judgment is GRANTED IN PART as set forth herein, and the parties' motions are otherwise DENIED.

### *Procedural History*

On June 9, 2005, the Securities and Exchange Commission ("SEC") filed an enforcement

1

action against Howard Waxenberg Trading, LLC, HKW Trading LLC, HKW Trading Fund I LLC, Downing & Associates Technical Analysis, and the Estate of Howard Waxenberg. (Case No. 8:05-cv-1076-T-24TBM, Dkt. 1). The SEC alleged that Howard Waxenberg ("Mr. Waxenberg") operated a Ponzi scheme between 1990 and 2005, involving approximately 200 hundred investors. (*Id.*, ¶¶1-2). Shortly before that action was filed, Mr. Waxenberg committed suicide. (*Id.*, ¶ 9).

In the course of the enforcement action, the Honorable Susan C. Bucklew appointed Burton W. Wiand as the Receiver over Howard Waxenberg Trading, LLC, HKW Trading LLC, HKW Trading Fund I LLC, Downing & Associates Technical Analysis, and the Estate of Howard Waxenberg (collectively, "the Receivership Entities") (Case No. 05-cv-1076, Dkts. 10, 44). The appointing Orders authorized the Receiver to take possession of the Receivership Entities' assets and to:

> institute such actions and legal proceedings, for the benefit and on behalf of the [Receivership Entities] and their investors and other creditors, as the Receiver deems necessary against those individuals, corporations, partnerships, associations and/or unincorporated organizations, which the Receiver may claim have wrongfully, illegally or otherwise improperly misappropriated or transferred monies or other proceeds directly or indirectly traceable from investors in the [Receivership Entities].
> (Dkt. 10 at 2-3).

The Receiver ultimately initiated eighty-five ancillary actions against investors, seeking to recover payments made by Mr. Waxenberg to those investors. The Receiver seeks to distribute recovered funds pro rata among all investors.

The instant case was the first ancillary case filed. It was commenced on October 5, 2005 against Mr. Waxenberg's wife, Zelda Waxenberg ("Mrs. Waxenberg") in her individual capacity. (Dkt. 2). The Receiver later added Mrs. Waxenberg in her capacity as Trustee of the Zelda Waxenberg Family Trust ("the Trust"). (Dkt. 20). In the Second Amended Complaint, the Receiver

2

seeks to recover three types of payments made to Mrs. Waxenberg[1]: (1) "return of principal" in the amount of $921,500.00, which represents Mrs. Waxenberg's principal investment with Mr. Waxenberg that he returned to her in 2003 and 2004; (2) "false profits" in the amount of $150,167.82, which represents Mrs. Waxenberg's purported earnings on her principal investment; and (3) "other transfers" in the amount of $799,784.05, which were not made in connection with Mrs. Waxenberg's investment, but were purportedly for the Waxenbergs' household and family expenses. The Receiver brings claims pursuant to Florida's Uniform Fraudulent Transfer Act ("FUFTA"), Fla. Stat. §§ 726.101 *et seq.* (Counts I, III, and V) and for unjust enrichment (Counts II, IV, and VI).[2] (Dkt. 65).

In the instant cross-motions for summary judgment and cross-motions to strike expert testimony, the parties primarily dispute three issues that are central to the Receiver's FUFTA and unjust enrichment claims: whether Mr. Waxenberg was operating a Ponzi scheme, whether Mrs. Waxenberg received payments from Mr. Waxenberg in good faith, and whether Mrs. Waxenberg supplied reasonably equivalent value for the payments. Based on the issues presented, the Court undertakes a brief review of Mr. Waxenberg's investment activities and Mrs. Waxenberg's participation in, and knowledge of, her husband's activities.

### Factual Background

The Waxenbergs were married in 1982. (Z. Waxenberg Dep. at 33).[3] Mr. Waxenberg was

---

[1] For the purposes of this Order, all investments and payments are considered to be made by and to Mrs. Waxenberg, as the parties have not clearly distinguished all investments and payments made by and to the Trust.

[2] On March 26, 2008, the Court dismissed additional claims in the Second Amended Complaint related to Mrs. Waxenberg's residence (Counts VII-X). (Dkt. 88). The Receiver's claim for an accounting (Count XI) remains pending.

[3] All references are to Mrs. Waxenberg's September 7, 2006 deposition, unless noted.

a trader and Mrs. Waxenberg, a licensed real estate broker in California, bought and sold investment properties. (Z. Waxenberg Dep. at 21-23, 55). The Waxenbergs moved to California in 1985, where Mr. Waxenberg "did his own trading" "with his own companies." (Z. Waxenberg Dep. at 55-56, 68). They lived together until Mr. Waxenberg moved to Florida in 2002, to live with the Waxenbergs' two sons while they attended a sports academy in Bradenton, Florida. (Z. Waxenberg Dep. at 31-32, 41; Morello Dec., Exh. A at 7-8, 25).

In January 1984, while the Waxenbergs were living in New York, Mr. Waxenberg was "permitted to resign" from Jeffries & Company in New York City for "[v]iolation of firm policies re options trading and other trading irregularities." (Z. Waxenberg Dep. at 54; Morello Dec., Exh. C). In June 1986, the National Association of Securities Dealers, Inc. ("NASD") brought a complaint against Mr. Waxenberg based on an alleged "scheme to defraud" Jeffries by falsifying firm order tickets. (Morello Dec., Exh. D). In March 1987, the NASD Board of Governors barred Mr. Waxenberg from association with any NASD member, noting that Mr. Waxenberg's "misconduct is especially egregious because it involved a deliberate attempt to perpetrate a fraud." (Morello Dec., Exh. F at 2). Mrs. Waxenberg testified that she had no knowledge of Mr. Waxenberg's problems with the NASD until after this action was filed. (Z. Waxenberg Dep. at 57).[4]

Mrs. Waxenberg contends that throughout their marriage, she and Mr. Waxenberg maintained independent financial lives, filing separate tax returns and sharing no ownership in real property or bank accounts. (Z. Waxenberg Dep. at 118, 178). Mrs. Waxenberg represents that she believed at all times that Mr. Waxenberg's investment activities were legitimate. (Dkt. 139, Exh.

---

[4] Because Mrs. Waxenberg returned to California in May of 1985 due to severe asthma, she believed that Mr. Waxenberg left New York to be with her. (Z. Waxenberg Dep. at 52-53).

1 at 25). Specifically, Mrs. Waxenberg contends that Mr. Waxenberg was "brilliant," constantly studied trading literature, and periodically attended conferences on securities and trading. (*Id*. at 24; Goellnitz Dep. II at 87). Mr. Waxenberg also wrote a newsletter on trading for a period of time, which both private investors and brokerage houses purchased. (Dkt. 139, Exh. 1 at 24; Goellnitz Dep. II. at 77-78). Mrs. Waxenberg states that Mr. Waxenberg would typically arise between 4:00a.m. and 4:30a.m. to prepare for the opening of the markets, and that she observed him in contact with traders and clients, saw checks on his desk for substantial sums of money, and occasionally observed him preparing charts and graphs related to trading. (Dkt. 139, Exh. 1 at 24). Mr. Waxenberg explained to her that he was successful in futures and options trading because he was able to leverage the market and was disciplined in applying his investment strategies. (*Id*. at 25).

2.      *Mr. Waxenberg's investment activities*

Between 1990 and his death in May 2005, Mr. Waxenberg, "in combination with one or more of [the Receivership Entities]," raised $135 million in connection with 238 investor accounts. (Oscher Dec. ¶ 17). Mr. Waxenberg operated his investment activities through Downing & Associates Technical Analysis ("DATA"), a fictitious "d/b/a" for Mr. Waxenberg, as well as three limited liability companies (collectively, "the Receivership LLCs"): Howard Waxenberg Trading, LLC ("HWT"), HKW Trading LLC ("HKW Trading"), and HKW Trading Fund I LLC ("Fund I").[5]

According to the contracts that Mr. Waxenberg provided to investors, he sold units or interests in three investment funds: The Downing & Associates Fund (operated by DATA), the

---

[5] The Receiver contends that between 1990 and 2002, DATA made payments to investors, that in the fourth quarter 2002, HWT began making payments to investors, and that in January 2004, HKW Trading and Fund I began making payments. The portions of exhibits cited by the Receiver indicate that HWT began making payments in January 2003, and that HKW Trading LLC and Fund I LLC began making transfers in February 2004. (*See* Dkt. 142 at 13 (citing Oscher Dec., ¶¶ 13, 14, 26; Exhs. 4 and 5)).

Howard Waxenberg Trading LLC Fund One (operated by HWT), and the HKW Trading Fund I LLC (operated by HKW Trading). (Morello Dec., Exhs. G-I). The investment contracts essentially provided that Mr. Waxenberg would trade index futures and options.[6] Each calendar quarter, investors received statements reflecting their beginning balances, withdrawals, deposits, interest earned, management fee, net income, and ending balances ("investor statements"). (Oscher Dec. ¶ 21, Exh. 7). Each quarter, investors also received a distribution of the "interest earned" on their investment, unless the interest was reinvested. (Oscher Dec. ¶¶ 23-24).

Debbie Goellnitz, Mr. Waxenberg's only employee, testified that she had no indication that Mr. Waxenberg was operating an illegal investment scheme, and that until the first quarter 2005, he timely paid all bills. (Goellnitz Dep. I at 22-23; Dep. II at 94, 97-98). Paul Rampell, another investor, testified that there was no indication of anything illegal, nor were than any deviations from Mr. Waxenberg's investment plan. (Rampell Dep. at 23, 73-74). Nonetheless, the Receiver contends that between at least 1990 and 2005, Mr. Waxenberg was operating a sizeable Ponzi scheme.[7]

According to Steven Oscher, the Receiver's accounting expert, Mr. Waxenberg pooled all money received from investors and did not maintain their investments in separate accounts. (Oscher

---

[6] Specifically, the DATA and HWT fund contracts specified that Mr. Waxenberg would trade on Standard & Poor's index futures, and "from time to time" purchase treasury bills for short-term investment of idle funds. (Morello Dec., Exh. G, ¶¶ 9-11; Exh. H, ¶¶ 10-12). The HKW Trading contract provided that "[a]lthough the Manager has broad discretion to trade a wide variety of instruments, the Manager expects the company's trading activities to involve primary exchange traded funds, index options and index based futures contracts." (Morello Dec., Exh. I at 12, 11).

[7] "The term 'Ponzi scheme' is derived from Charles Ponzi, a famous Boston swindler. With a capital of $150, Ponzi began to borrow money on his own promissory notes at a 50% rate of interest payable in 90 days. Ponzi collected nearly $10 million in 8 months beginning in 1919, using the funds of new investors to pay off those whose notes had come due." *United States v. Silvestri,* 409 F.3d 1311, 1317 n.6 (11th Cir. 2005) (quoting *United States v. Masten,* 170 F.3d 790, 797 n. 9 (7th Cir. 1999)).

Dec. ¶ 20). Oscher opines that Mr. Waxenberg held only a very small portion of investor principal in trading accounts. (Oscher Dec., ¶ 49, Exh. 10). Oscher also opines that the trading accounts operated by Mr. Waxenberg lost money in twenty-five of the twenty-nine quarters analyzed. (Socher Dec., ¶ 44, Exh. 10). Nonetheless, Mr. Waxenberg always generated positive quarterly returns for investors, approximately 16% to 20%. (Oscher Dec., ¶¶ 39, Exh. 10). Oscher concludes that the only way for Mr. Waxenberg to pay consistently positive returns was by using the investments of newer investors, the hallmark of a Ponzi scheme. (Oscher Dec., ¶¶ 60-61).

3. *Payments to Mrs. Waxenberg*

On March 14, 2001, Mrs. Waxenberg, as Trustee, executed a Trading Agreement with DATA and invested $150,000.00. (Morello Dec., Exh. G at 10; Oscher Dec., Exh. 4). Mrs. Waxenberg ultimately invested a total of $921,500.00. (Oscher Dec., Exh. 4). Between April 2001 and January 2003, Mrs. Waxenberg received $97,419.78 in transfers from an account in DATA's name. (Dkt. 65, Exh. A). Between April 2003 and October 2003, she received $53,082.44 in transfers from an account in HWT LLC's name. (*Id*). The Receiver categorizes $150,167.82 of these transfers as earnings on the investment, or "false profits."[8]   (Dkt. 65, ¶¶ 113, 124).

On December 9, 2003 and January 21, 2004, Mrs. Waxenberg also received two distributions from HWT totaling $921,165.60, which the Receiver categorizes as "returns of principal." (Oscher Dec., Exh. 4; Morello Dec., Exh. A at 25). These transfers of principal were not made pursuant to a request by Mrs. Waxenberg. (Morello Dec., Exh. A at 25). Rather, Goellnitz and Mrs. Waxenberg testified that Mr. Waxenberg returned the money because he was upset that Mrs. Waxenberg shared

---

[8] Although these transfers totaled $150,502.22, Mrs. Waxenberg received a return of principal that was $334.40 less than her original investment. Pursuant to the "netting" rule urged by the Receiver (Dkt. 142 at 20-21), the Receiver has subtracted $334.40 from $150,502.22, for a "false profit" claim of $150,167.82 (Dkt. 142 at 11).

information regarding Mr. Waxenberg's health with her sister. (Goellnitz Dep. I at 26; Z. Waxenberg Dep. at 112-14).[9]

The Receiver also alleges that Mrs. Waxenberg received $799,784.05 in "other transfers" from the time Mr. Waxenberg began perpetrating his scheme through HWT, which were not made in connection with her investment.[10] (Morello Dec., Exh. A at 25, 29-32, Exh. O). Mrs. Waxenberg maintains that these payments were for household and family expenses. She invoiced Mr. Waxenberg these expenses, on the advice of an attorney, to demonstrate that he supported his children and household in case their relationship ended. (Z. Waxenberg Dep. at 42). The invoices included all expenses associated with the mortgage payment, home insurance, utilities, groceries, supplies, and education and sports expenses for the Waxenbergs' sons; and fifty percent of expenses for household repairs, furnishings, books, pets, an auto lease, auto insurance, gas, and health insurance premiums. (*See, e.g.*, Dkt. 139, Exh. 8 at 8-1). Mrs. Waxenberg paid her own personal expenses, including expenses for business, travel, medical bills, clothes, and art. (Porter Dep. at 65-66).

In her motion for summary judgment, Mrs. Waxenberg argues that: (1) the Receiver does not have standing to sue for payments made directly to her by DATA or by Mr. Waxenberg; (2) the Receiver's claims are barred by the defense of in pari delicto; (3) the Receiver's FUFTA claims fail because she received all payments in good faith and provided reasonably equivalent value for the

---

[9] By contrast, the Receiver cites an undated, unsigned letter, which is not addressed to any individual, on HWT letterhead, stating: "I am taking a four month sabbatical from managing client funds. With this event I am returning the principle [*sic*] to my clients from their respective accounts. Interest income from these accounts will be paid on January 1, 2004. I will inform each of you when I will begin managing client money again." (Morello Dec., Exh. N). As Mrs. Waxenberg produced the document in discovery (Morello Dec., ¶ 16), an inference could be taken that the letter was sent to Mrs. Waxenberg from Mr. Waxenberg.

[10] The Receiver does not seek to recover the $1,317,575.40 that Mrs. Waxenberg allegedly received from Mr. Waxenberg and DATA between January 1990 and September 2002. (Oscher Dec., ¶ 59, Exh. 12).

"return of principal" and "other transfers"; and (4) the Receiver's unjust enrichment claims for "return of principal" and "other transfers" fail because it would not be inequitable for her to retain these amounts. In the Receiver's cross-motion for summary judgment, he argues that: (1) Mr. Waxenberg was operating a Ponzi scheme, which demonstrates actual intent to defraud for the purposes of the FUFTA claims; (2) Mrs. Waxenberg did not take the payments in good faith and did not give reasonably equivalent value for the "false profits" or "other transfers"; and (3) it would be inequitable for Mrs. Waxenberg to retain any payments made to her. The parties have also filed cross-motions to strike the opposing party's accounting experts, which are addressed herein.

As set forth below, the Court finds that issues of fact exist regarding Mrs. Waxenberg's good faith, whether she took the payments for reasonably equivalent value, and whether it would be inequitable for her to retain the transfers, which preclude summary judgment on the majority of the FUFTA and unjust enrichment claims. The Court does, however, grant Mrs. Waxenberg's motion as to: (1) the Receiver's constructive fraud claims pursuant to FUFTA on the "return of principal" in Count I, because Mrs. Waxenberg gave reasonably equivalent value for these transfers, as a matter of law; and (2) the unjust enrichment claims in Counts IV and VI to the extent the Receiver seeks recovery of transfers made from accounts held in the name of DATA or Mr. Waxenberg, because there is no evidence that the Receivership LLCs conferred the requisite direct benefit on Mrs. Waxenberg as to these transfers.

### *Standard*

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v.*

9

*Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

### *Discussion*

### *A.    Standing*

As an initial matter, Mrs. Waxenberg argues that Receivership LLCs lack standing to sue for payments made to her from accounts held in the name of DATA and Mr. Waxenberg. Although Mrs. Waxenberg does not specifically identify the challenged transfers, they would appear to include

10

$97,419.78 in "false profits" transferred to Mrs. Waxenberg by DATA and the majority of the $799,784.05 in "other transfers" to Mrs. Waxenberg purportedly for household and family expenses.[11] Mrs. Waxenberg correctly recognizes that this Court has held in the Omnibus Orders on the motions to dismiss in the ancillary cases that claims on behalf of the Estate of Howard Waxenberg and DATA were dismissed with prejudice. (Dkt. 63 at 3-6; Dkt. 88 at 2-3).

With respect to the transfers made by DATA, the Receiver now argues that he is only seeking transfers made by DATA while HWT was in operation because HWT was the successor in interest to DATA and may thus recover on DATA's transfers. This argument has previously been addressed and rejected by this Court. (Dkt. 88 at 2). The Receiver continues to acknowledge that "DATA did not have an independent business form." (Dkt. 142 at 7). The Court thus iterates the holding in the March 26, 2008 Omnibus Order that claims by DATA stand dismissed with prejudice. (Dkt. 88 at 3). *See Troelstrup v. Index Futures Group, Inc.*, 130 F.3d 1274, 1277 (7th Cir. 1997).[12]

On the other hand, FUFTA permits creditors -- here, the Receivership LLCs -- to recover for transfers by a debtor -- here, Mr. Waxenberg -- of the debtor's assets to a third party. Fla. Stat. § 726.102(1),(12). Thus, the issue is not, as Mrs. Waxenberg argues, whether the *Receivership LLCs'* assets were transferred to Mrs. Waxenberg, but rather whether *Mr. Waxenberg's* assets were

---

[11] Five of these "other transfers" were made by HWT, totaling $123,450.20. (Dkt. 65, Exh. B at 40-41). The Court assumes these transfers are not the subject of Defendant's motion.

[12] The Receiver's authority is also inapposite. For instance, in *Amjad Munim, M.D., P.A. v. Azar*, 648 So. 2d 145, 154 (Fla. 4th DCA 1994), which involved a FUFTA claim, the Court determined that the *debtor* professional association fraudulently transferred its interest to a *transferee* professional association (and successor in interest), a typical fraudulent transfer scenario. In this case, by contrast, the Receiver seeks to apply the successor in interest theory between DATA, which is not alleged to be a debtor, to a creditor, HWT, rather than a third-party transferee. The Receiver's approach finds no support in the cited case law. *See also Graham v. James*, 144 F.3d 229, 240 (2d Cir. 1998) (similar facts as in *Azar*); *Baca v. Depot Sales, LLC*, No. 06-cv-714, 2007 WL 988061, at *4 (D. Colo. Mar. 30, 2007) (same); *LiButti v. United States*, 178 F.3d 114, 123 (2d Cir.1999) (addressing personal jurisdiction issue under Rule 25 of the Federal Rules of Civil Procedure).

11

transferred to her. The Court has previously observed that there is a question as to whether Mr. Waxenberg had rights in the Receivership LLCs' funds sufficient to render them his "assets" under FUFTA. (Dkt. 88 at 4-7). The Court now expressly holds that Mr. Waxenberg's assets include funds in accounts held in the name of DATA and Mr. Waxenberg. The Receivership LLCs have standing to recover these assets because they were allegedly injured by Mr. Waxenberg's transfers to Mrs. Waxenberg, as the assets were not available to pay the Receivership LLCs' claims as creditors.

Accordingly, the Receivership LLCs may properly recover on transfers made by DATA and Mr. Waxenberg to Mrs. Waxenberg pursuant to FUFTA, to the extent the transfers are within the statute of limitations and otherwise meet the statutory criteria. Defendant's motion for summary judgment on the FUFTA claims due to lack of standing is therefore DENIED.

With respect to the unjust enrichment claims, Mrs. Waxenberg correctly argues that Florida law provides that a plaintiff must directly confer a benefit on the defendant in order to recover pursuant to an unjust enrichment theory. *See, e.g.*, *Huntsman Packaging Corp. v. Kerry Packaging Corp.*, 992 F. Supp. 1439, 1446 (M.D. Fla. 1998) (citing *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla., N.A.*, 667 So. 2d 876, 879 (Fla. 3d DCA 1996)); *Tambourine Comerico Int'l. S.A. v. Solowsky*, No. 06-20682, 2007 WL 689466, at *8 (S.D. Fla. Mar. 4, 2007). She contends that any transfers from DATA or Mr. Waxenberg did not involve the conferral of a direct benefit from the Receivership LLCs to Mrs. Waxenberg.

The Receiver first argues in response that because Mr. Waxenberg had only trivial income from legitimate business, any money in his personal accounts necessarily consisted of money raised through Receivership LLCs. The Receiver relies on the following portion of Oscher's Declaration

in support:

> I also did not see evidence of any influx to Waxenberg or the Receivership Entities of more than a negligible amount of money from any source other than investors. Although Waxenberg earned interest from holding investors' money in low yield investments, such as U.S. Treasury Bills and money market accounts, the interest earned ranged from less than 1% to no more than 5%. That interest was insufficient to generate the money needed to pay *the investment returns that Waxenberg and the Receivership Entities paid to investors.* (Oscher Dec., ¶ 46) (emphasis added).

Oscher does not, however, specify the "negligible amount" of legitimate income or declare that it was insufficient to pay the "other transfers" to Mrs. Waxenberg. These expenses could be deemed "negligible" compared to the $135 million that Oscher declares Mr. Waxenberg raised in connection with his alleged Ponzi scheme. (Oscher Dec., ¶ 17). Oscher also fails to specifically address the impact of Mr. Waxenberg's independent income from his trading newsletter.[13]

Second, the Receiver argues that Mr. Waxenberg's and DATA's accounts served as a "conduit" for transfers of the Receivership LLCs' funds to Mrs. Waxenberg. (Dkt. 147 at 6). While the Court does not rule out the possibility that this could constitute a "direct" benefit in certain cases, the Receiver points to no evidence demonstrating that Mr. Waxenberg's or DATA's accounts actually served as conduits for the transfer of funds from the Receivership LLCs to Mrs. Waxenberg. Indeed, Oscher testified that he did not trace funds from the Receivership LLCs to Mr. Waxenberg or to DATA. (Oscher Dep. at 197).[14]

Although this Court's own review of Oscher's charts indicate that a few transfers were made

---

[13] The Receiver also relies on a response to a request for admission, which states that "Zelda admits she believed Howard Waxenberg's primary source of income was derived from his management of investments." (Morello Dec., Exh. A at 25). This statement is not sufficient to create a dispute as to whether Mr. Waxenberg earned enough income to make the "other transfers" at issue.

[14] He further testified: "Are there moneys that were commingled that may have been transferred to Howard Waxenberg from other receivership entities? Possibly." (Oscher Dep. at 200-201).

from HWT into Mr. Waxenberg's and DATA's accounts (*See, e.g.*, Oscher Dec., Exh. 8 at 1, 14, 24, 25, 27, 29), the Receiver has pointed to no evidence indicating the dates of these transfers or whether any transfers were made from these accounts to Mrs. Waxenberg, sufficient to support tracing of the funds.[15] *See In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 708-09 (11th Cir. 2005) (in a bankruptcy case, noting that "proper tracing does not require dollar-for-dollar accounting;" rather, "equity will follow a fund through any number of transmutations, and preserve it for the owner as long as it can be identified.").

At this stage of the litigation, Rule 56 requires the Receiver to come forward with specific record evidence supporting his claim. *Celotex*, 477 U.S. at 323-24. In the face of a properly briefed motion for summary judgment, the Receiver has failed to do so. Defendant's motion for summary judgment on the unjust enrichment claims is therefore GRANTED IN PART as to the unjust enrichment claims in Counts IV and VI, to the extent the Receiver seeks recovery of transfers made from accounts held in the name of DATA or Mr. Waxenberg.

### B.   *In pari delicto*

Mrs. Waxenberg also asserts that the Receiver's claims are barred by the doctrine of in pari delicto, which provides that where the wrong of one party equals that of the other, the defendant is in the stronger position. Fl. Jur. Equity § 76. This Court previously declined to address the doctrine at the motion to dismiss stage, holding that under Florida law, it was premature to address the relative fault of the parties. (Dkt. 63 at 13). In the instant motion for summary judgment, Mrs. Waxenberg argues that because Mr. Waxenberg exercised "sole domination and control" over the

---

[15] Although the Receiver has appended to Oscher's Declaration several hundred pages of detailed spreadsheets, Oscher has not addressed them with any specificity. It is not for this Court to interpret, without the benefit of sworn explanations, the Receiver's expert's documentation.

Receivership Entities, his wrongful acts are imputed to the Receivership Entities, and thus, to the Receiver. This Court disagrees.

As the case relied on by Mrs. Waxenberg held in addressing civil RICO claims, it is well-established that the in pari delicto doctrine "bars recovery by a corporation whose sole shareholder is engaged in wrongdoing." *Liquidation Comm'n of Banco Intercont'l, S.A. v. Renta*, 530 F.3d 1339, 1355 (11th Cir. 2008). "The defense is, however, not available *because* of the wrongdoer's ownership of a plaintiff corporation, but because of his agency relationship with it." *Id.* Thus, under Mrs. Waxenberg's authority, the controlling question is:

> not whether *in pari delicto* would bar recovery by [the Receivership Entity] if it is a wrongdoer - *Edwards* is clear that it would - but whether [the Receivership Entity] is a wrongdoer at all, that is, whether the wrongdoing of its agents should be imputed to it. The adverse interest exception addresses this question, and it typically presents a jury question. *Id.*

The adverse interest exception "is narrow and applies only when the agent has 'totally abandoned' the principal's interests." *Bank of China, N.Y. Branch v. NBM LLC*, 359 F.3d 171, 179 (2d Cir. 2004). In *Renta*, the Eleventh Circuit found there was sufficient evidence that the agent in that case fell within the exception, as he had looted his corporation. *Renta*, 530 F.3d at 1355. As a result, the Eleventh Circuit did not impute his wrongdoing to the corporation.[16] *Id.*

The holding in *Renta* does not, as Mrs. Waxenberg argues, mark a departure from the cases relied upon by this Court in the Omnibus Orders on the motions to dismiss. Indeed, it is entirely consistent with the result attained in *Scholes v. Lehman*, in which the Seventh Circuit permitted a receiver to bring a fraudulent transfer claim against a Ponzi scheme perpetrator on the theory that

---

[16] Given Mrs. Waxenberg's own arguments concerning Mr. Waxenberg's illegal conduct, there is, at the least, an issue of fact as to Mr. Waxenberg's degree of fault and therefore whether the defense of in pari delicto applies. *See Renta*, 530 F.3d at 1354 ( "[i]mputation is inappropriate where a jury could permissibly conclude that an agent . . . was engaged in fraud or self-dealing adverse to a corporate principal").

the corporation was "cleansed" by the appointment of the Receiver and was no longer the perpetrator's "evil zombie." *Scholes v. Lehman*, 56 F.3d 750, 754 (7th Cir. 1995). It is also consistent with Florida law, which provides that the in pari delicto defense is not "woodenly applied in every case;" and that because "the principle is founded on public policy, it may give way to a supervening public policy." *Kulla v. E.F. Hutton & Co., Inc.*, 426 So. 2d 1055, 1057 n.1 (Fla. 3d DCA1983); *see also Off. Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1152 (11th Cir. 2006) (noting that application of in pari delicto to federal statute is decided, in part, based on policy goals of federal statute).

Based on the foregoing, the Court finds that issues of fact exist as to the parties' relative fault, and Defendant's motion for summary judgment on the defense of in pari delicto is therefore DENIED.

### C. Ponzi scheme

Next, the Receiver requests summary judgment on the issue of whether the Receivership Entities were operated as a Ponzi scheme. This is a key issue, as the existence of a Ponzi scheme suffices, as a matter of law, to prove actual intent to defraud for the purposes of the Receiver's § 725.105(1)(a) FUFTA claims, as set forth in Section D, *infra. See In re McCarn's Allstate Fin., Inc.*, 326 B.R. 843, 850 (Bankr. M.D. Fla. 2005).[17] The existence of a Ponzi scheme is also relevant to a weighing of the equities for the purposes of the Receiver's unjust enrichment claims, as discussed in Section E, *infra.*

A Ponzi scheme is a "phony investment plan in which monies paid by later investors are used

---

[17] In other cases, actual intent must be determined by considering the statutory "badges of fraud," which typically presents a jury question. Fla. Stat. § 726.105(2)(a)-(k).

to pay artificially high returns to the initial investors, with the goal of attracting more investors." *United States v. Silvestri*, 409 F.3d 1311, 1317 n.6 (11th Cir. 2005). In order to prove the existence of a Ponzi scheme, the Receiver must establish that: (1) deposits were made by investors; (2) the Receivership Entities conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the Receivership Entities produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors. *In re Canyon Sys. Corp.*, 343 B.R. 615, 630 (Bankr. S.D Ohio 2006).

The Receiver argues that these facts are undisputed and that Mr. Waxenberg was operating a Ponzi scheme between at least 1998 and 2005. Although Mrs. Waxenberg does not specifically argue that Mr. Waxenberg was *not* operating a Ponzi scheme, she does attack the conclusions of the Receiver's expert, Steven Oscher, through her own expert, Lloyd Morgenstern. Both parties have filed motions to limine to exclude the opposing party's expert testimony, which are addressed herein.

1. *Receiver's evidence of a Ponzi scheme*

As to the first element, it is undisputed that investors made deposits by purchasing interests in three investment funds. Mr. Waxenberg then directly deposited investor money into ten bank accounts titled in the name of Mr. Waxenberg, DATA, HWT, "Howard Waxenberg Trading," and Fund I. (Oscher Dec. ¶¶ 26-27). Exhibit 10 to Oscher's Declaration shows the principal invested for each calendar quarter between 1998 and 2005 totaled $106,494,684.97 through March 2005. (Oscher Dec., Exh. 10, "Total Investor Principal").

As to the second element, Oscher opines that there is no evidence "of more than a negligible amount of money from any source other than investors." (Oscher Dec., ¶ 46). Oscher acknowledged that Mr. Waxenberg earned money by holding investors' money in low yield investments, such as

17

U.S. Treasury Bills and money market accounts, but that the interest paid on these investments -- one to five percent -- was insufficient to generate the returns actually paid to investors. (*Id.*) Oscher also opines that Mr. Waxenberg transferred only a small portion of investor's principal in trading accounts, ranging from 6.29% (fourth quarter 1999) to 32.36% (third quarter 2004). (Oscher Dec., Exh. 10 "Percentage of Investor Principal Transferred to Trade and Bank Accounts").

As to the third element, the Receiver argues that Mr. Waxenberg consistently lost money on his trading activities. Oscher opines that in each year between 1998 and 2005, the trading accounts operated by Mr. Waxenberg lost money. (Oscher Dec. ¶ 44, Exh. 10). Specifically, in twenty-five of the twenty-nine quarters analyzed, the trading accounts lost money, ranging from $4,572.07 in the fourth quarter 1998 to $2,152,475.98 in the third quarter 2004. (Oscher Dec. ¶ 44, Exh. 10, "Trade Accounts Actual Returns").[18] Oscher opines that based on the balances in Mr. Waxenberg's trading accounts, the accounts would have had to generate annualized net returns ranging from 98% (fourth quarter 2002) to 3336% (fourth quarter 2000) in order to pay investors an average of 15% on their principal investment. (Oscher Dec. ¶ 48, Exh. 10 "Annualized Return Required to Pay Investors(1)").

As to the fourth element, the Receiver argues that based on the absence of trading profits, the money transferred to investors was actually investors' principal. In opining that Mr. Waxenberg was operating a classic Ponzi scheme, Oscher determined: "there were no profits to pay the returns the investors received from at least 1990 forward, and . . . the only way money was available for

---

[18] For instance, based on financial statements prepared by an independent CPA before Mr. Waxenberg's death, Fund I lost $198,224.00 in the last half of 2004. (Morello Dec., Exh. R at 6). The Receiver contends that Fund I investors received a 20% annualized (5% per quarter) return on their investment, although the cited documents do not clearly support this contention. (Dkt. 142 at 15 (citing Oscher Dec., Exh. 5 at 1, 20-30, 42)).

distribution by Waxenberg and Receivership Entities was as a result of new investor contributions or the 'rolling over' of existing investor balances." (Oscher Dec., ¶ 61).

Finally, although the foregoing analysis pertains only to investment activity occurring between 1998 and 2005, Oscher opines that Mr. Waxenberg's activities between 1990 and 1997 were "consistent" with the 1998-2005 period (Oscher Dec., ¶ 52). Between 1991 and 1997, the bank, brokerage, and trading accounts used by Mr. Waxenberg always had a collective balance lower than the principal invested for the same period. (Oscher Dec. ¶ 56, Exh. 11). Mr. Waxenberg transferred a similarly small amount of investor principal into trading accounts, ranging from 0-2% in several quarters to 21.81% in the first quarter 1991. (Oscher Dec., Exh. 11 "Percentage of Investor Principal Transferred to Trade Accounts"). The trading accounts suffered losses in thirteen of the twenty-five quarters for which the Receiver has records. (Oscher Dec., ¶ 57 "Trade Accounts Actual Returns").

Mrs. Waxenberg has proffered her own expert, Morgenstern, to refute Oscher's conclusions. Mrs. Waxenberg argues that: (1) Oscher is unqualified to render an opinion as to the investment strategies of Mr. Waxenberg and the Receivership Entities; (2) Oscher had insufficient documentation for the 1990-1997 period and could not account for $10.9 million in investor deposits; (3) Oscher failed to trace $11.1 million in investor deposits during the 1998-2005 period; and (4) Oscher failed to separate the investment activities of Mr. Waxenberg and DATA (for which the Receiver does not have standing to sue) from the investment activities of the Receivership LLCs. Mrs. Waxenberg has primarily presented these arguments through her motion to strike Oscher's expert testimony, which is accompanied by the Receiver's motion to strike Morgenstern's expert testimony. The Court accordingly turns to the parties' motions to strike.

2. *Motions to Strike*

Before expert testimony can be admitted pursuant to Fed. R. Evid. 702, this Court must act as a gatekeeper and screen the proffered evidence to ensure that it is relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Expert testimony is properly admitted when (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1999); Fed. R. Evid. 702. The party proffering the expert bears the burden of establishing the proper foundation for the admissibility of the expert's testimony by a preponderance of the evidence. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

a. *Motion to strike Morgenstern's testimony*

The Receiver moves to strike the expert testimony of Morgenstern, contending that he based his opinion entirely on reports generated by Oscher, without any independent analysis of the documents on which Oscher relied in preparing the reports. However, Morgenstern specifically testified in his deposition that he reviewed documents underlying Oscher's work on a "test basis" and that he "assumed Mr. Oscher was capable of preparing the spreadsheets from the documents he looked at." (Morgenstern Dep. at 15, 17; Dkt. 144-23, Exh. A). Morgenstern also independently prepared a summary of untraced deposits between 1998 and 2005. (Dkt. 144-23, Exh. B).

The cases cited by the Receiver in the motion are inapposite.[19] The Receiver acknowledges that "accountants routinely make assumptions, apply them to data provided by others, and draw conclusions therefrom." *In re Dow Corning Corp.*, 237 B.R. 364, 368 (Bankr. E.D. Mich. 1999); *see also In re Lake States Commodities, Inc.*, 271 B.R. 575, 585 (Bankr. N.D. Ill. 2002) ("an expert can rely on inadmissable hearsay evidence such as another expert's report, in arriving at an opinion.) In this case, Morgenstern may properly challenge Oscher's methodology and assumptions, notwithstanding the fact that he does not offer a competing opinion as to whether a Ponzi scheme existed. *See, e.g., 1st Source Bank v. First Resource Fed. Credit Union*, 167 F.R.D. 61 (N.D. Ind. 1996); *Slicex, Inc. v. Aeroflex Colo. Springs, Inc.*, No. 2:04-cv-615, 2006 WL 1932344, at *3 (D. Utah July 11, 2006); *CDA of Am. Inc. v. Midland Life Ins. Co.*, No. 01-cv-837, 2006 WL 5349266, 6 (S.D. Ohio Mar. 27, 2006).

The Court finds that Morgenstern's opinion is relevant and helpful to the trier of fact for the limited purpose for which it is offered -- identifying purported weaknesses in Oscher's analysis -- and it will be admitted to this extent. The Receiver's motion to strike is therefore DENIED. Morgenstern will not, however, be permitted to opine as to whether a Ponzi scheme did or did not exist, or as to whether there was insufficient data for Oscher to opine as to whether a Ponzi scheme existed, as these were not opinions provided in his expert report.

b.    *Motion to strike Oscher's testimony*

Mrs. Waxenberg moves to strike Oscher's testimony on the grounds that he is unqualified,

---

[19] *Cf. In re Bonham*, 251 B.R. 113, 135 (Bankr. D. Alaska 2000) (where debtor's expert testified that trustee's expert missed $3,000,000 revenue, court found debtor's expert exhibited a "gross misunderstanding," as purported ticket revenue did not actually exist); *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1013 (C.D. Cal. 2003) (defendant offered an expert unqualified in residual valuation to introduce the opinion testimony of a purported residual valuation expert in another case); *In re Lake States Commodities, Inc.*, 271 B.R. 575, 585 (Bankr. N.D. Ill. 2002) (expert relied on another report not in evidence).

that his methodology is unreliable, and that is opinion is not relevant. These arguments are addressed, and rejected, in turn.

*(1) Qualifications*

Mrs. Waxenberg argues that Oscher does not have sufficient experience in futures trading to render an opinion as to whether Mr. Waxenberg required contributions from other investors to sustain his trading activities. However, Oscher is a Certified Public Accountant and has worked in accounting for over twenty-five years, with significant experience as an auditor. (Oscher Dec. ¶¶ 1-2, Exhs. 1-2). Oscher is also a Certified Fraud Examiner and has extensive experience working on matters involving fraud and forensic accounting, including cases involving Ponzi schemes. (Oscher Dec. ¶ 2, Exh. 2; Oscher Dep. at 16-17). Oscher's education and training more than adequately qualify him to analyze the pertinent financial data to determine investor deposits, trading losses, and investor payments, and to opine as to whether there was a Ponzi scheme based on these facts. *See In re Bayou Group, LLC*, 396 B.R. 810, 836 (Bankr. S.D.N.Y. 2008).[20]

*(2) Methodology*

Mrs. Waxenberg also challenges the methodology Oscher employed in rendering an opinion as to whether Mr. Waxenberg was operating a Ponzi scheme. Specifically, Mrs. Waxenberg argues that: (1) Oscher had insufficient documentation to conduct a reliable analysis with respect to the 1990-1997 period due to the lack of available records; (2) Oscher failed to account for $10.9 million in investor funds for the 1990-1997 period; and (3) Oscher failed to account for $11 million in investor funds during the 1998-2005 period.

---

[20] Additionally, Mrs. Waxenberg argues that Oscher is a "captive expert," as he relied entirely on documents provided to him by the Receiver, and is therefore unreliable. The Receiver maintains that Oscher received all financial and other documents that came into the Receiver's control. In the motion to strike, Mrs. Waxenberg has provided no support for the suggestion that documents were withheld from Oscher, or from her.

*(a)*     *1990-1997*

With respect to the documentation from the 1990-1997 period, Oscher declared that the information was incomplete, but was of the type "reasonably relied upon" to reconstruct the Receivership Entities' financial affairs and determine whether their investment activities were a Ponzi scheme or other fraud. (Oscher Dec., ¶¶ 9-10). Although Oscher declared that the information "became more voluminous as time went by" (Oscher Dec. ¶ 54), he testified that he did not know how much information was missing (Oscher Dep. at 39). The Receiver stated in his December 8, 2008 "Seventh Interim Report" in the SEC enforcement action that he had obtained records of varying degrees of completeness from 171 of the 240 investors. (Case No. 05-cv-1076, Dkt. 253-2 at 9). Because financial institutions are only required to maintain documents for approximately six years, the Receiver "depended" on documents provided by investors or recovered from Mr. Waxenberg's computer files. (*Id.* at 9).[21]

Expert testimony must be "based upon sufficient facts or data." Fed. R. Evid. 702. Thus, "it remains a basic foundation for admissibility that proposed expert testimony must be supported by appropriate validation - *i.e.,* 'good grounds,' based on what is known." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). In the instant case, it appears that the Receiver recovered documents from approximately seventy percent of the investors, as well as computer files from Mr. Waxenberg. Although Morgenstern's report indicates that twenty-one of twenty-six bank accounts have missing documentation or contain items for "further investigation,"[22] he has not described the

---

[21] Although the Receiver now contends that he received additional documents, the Receiver has not cited any admissible evidence supporting this assertion. Nor does he identify or quantify the new documents. (Dkt. 150 at 15).

[22] Mrs. Waxenberg argues that Oscher has designated substantial transfers as requiring further "investigation" on the charts prepared in connection with the analysis of the accounts. (*See, e.g.*, Dkt. 141, Comp.

incomplete records with any more detail. It is well-accepted that "trained experts commonly extrapolate from existing data." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Oscher's conclusion is directly connected to the data he had, which was substantial, and was premised on an underlying methodology of calculating deposits, profits, and payments that Mrs. Waxenberg does not challenge. Accordingly, the missing records from 1990-1997 do not, by themselves, render Oscher's methodology unreliable.

Mrs. Waxenberg also argues that Oscher failed to account for approximately $10.9 million in investor funds deposited during the 1990-1997 period. Oscher testified that at the end of December 31, 1997 there should have been $11,433,000.00 in the accounts, but his records showed balances totaling $573,046.21. (Oscher Dep. at 167-68; Comp. Exh. 4 at 11). Mrs. Waxenberg argues that the discrepancy of $10.9 million could be in other accounts that the Receiver has failed to identify, and that these accounts may have yielded a trading profit for the 1990-1997 period.

By contrast, the Receiver contends that the unaccounted-for $10.9 million is further evidence that Mr. Waxenberg was operating a Ponzi scheme, as investor money was not in the accounts that it should have been. Specifically, Oscher's analysis of investor statements indicates that through December 31, 1997, all deposits by investors, totaling $11,433,607.50, were made into and from the same Bank of America bank account ending in 9982, which was titled in DATA's name ("Account 9982"). (Oscher Dec., Exh. 5). All payments to investors were also made from Account 9982. (*Id.*) Nonetheless, as of December 31, 1997, Account 9982 had a balance of $344,656.69 and all of the accounts operated by Mr. Waxenberg, including Account 9982, had a collective balance

Exhs. 5, 6). As the Receiver argues, however, these transfers concern the movement of funds among the various accounts, and do not address how much was invested, generated in trading, or paid to investors. As such, they are not relevant to the determination of whether there was a Ponzi scheme.

of $573,046.21. (Oscher Dec., Exh. 11 at 2-3). As a result, the Receiver argues that the $10.9 million discrepancy buttresses Oscher's conclusion that Mr. Waxenberg was using invested principal, instead of trading profits, to pay the "returns" to investors.

Given the nature of a Ponzi scheme, an inability to reconcile and balance the account balances does not render Oscher's opinion unreliable.

*(b)*     *1998-2005*

For the period between 1998 and 2005, Oscher reviewed investor statements and statements for all bank, brokerage, and trading accounts controlled by Mr. Waxenberg and the Receivership Entities, with the exception of one monthly statement from one bank account. (Oscher Dec. ¶ 8). However, as Mrs. Waxenberg argues in the motion to strike, Oscher testified that he could not locate $11 million in investor deposits in any bank or trading account. (Oscher Dep. at 128, 131). He also testified that he did not request that the Receiver obtain documentation from investors' financial institutions to identify in which accounts the deposits were made. (Oscher Dep. at 130). Mrs. Waxenberg contends that this renders Oscher's methodology unreliable.

Oscher now avers, however, that the true number of untraced deposits is $9,066,221.09, as he has since determined that $2,090,00.00 of investor account deposits were in fact traced. (2nd Oscher Dec. ¶ 16). Oscher also avers that for this same period there are $8,952,216.39 in deposits in bank accounts for which he could not identify the source. (2nd Oscher Dec., ¶ 16, Exh. 1 at 4). As a result, the Receiver argues that these funds are "in all likelihood" the untraced investor deposits. (Dkt. 150 at 20). This leaves a discrepancy of $114,004.80, rather than $11.1 million. (2nd Oscher Dec., ¶ 23). The Court finds that this discrepancy is appropriately addressed in cross-examination of Oscher, not in a motion to strike. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d

25

1333, 1345-46 (11th Cir. 2003) ("The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination.)

*(3)    Relevance*

Finally, Mrs. Waxenberg argues that Oscher's opinion should be excluded as unreliable, irrelevant, and not helpful to the trier of fact because he did not opine that the Receivership LLCs operated a Ponzi scheme or that the Receivership LLCs made transfers to Mrs. Waxenberg. When asked during his deposition if he could opine whether the Receivership LLCs were operating a Ponzi scheme, Oscher stated:

> I don't know how to answer your question because the body of information and the way in which Mr. Waxenberg was moving moneys in and out of the various bank accounts or trading accounts for the various corporate entities indicates that there's a complete mass of information as opposed to a specifically isolated entity like you were just asking me the question for. (Oscher Dep. at 34-35).

In a similar vein, Mrs. Waxenberg argues that Oscher's opinion fails to account for the fact that none of the Receivership LLCs were in use before 2003, that only thirteen of the sixty-four accounts Oscher analyzed were held in the name of an LLC, that the claims for transfers made by DATA and the Estate of Howard Waxenberg have been dismissed with prejudice, and that this Court has dismissed certain claims based on the statute of limitations.

Oscher's testimony is not rendered unreliable in this regard. For the purposes of the FUFTA claims, the issue is whether the *debtor* was operating a Ponzi scheme, which presumptively indicates the debtor's actual intent to defraud his creditors. *See* Fla. Stat. § 726.105(1)(a). Here, the "debtor" is Mr. Waxenberg. (Dkt. 65, ¶ 96). Accordingly, the only question is whether Mr. Waxenberg was operating a Ponzi scheme. In this regard, Oscher's testimony is relevant and helpful to the trier of fact by "calculating, compiling, and explaining" the finances of the Receivership Entities to render

the opinion that Mr. Waxenberg was operating a Ponzi scheme through the Receivership Entities. *See City of Tuscaloosa*, 158 F.3d at 563-64.

Based on the foregoing, Oscher is qualified, his methodology is reliable, and his opinion is relevant and helpful to the trier of fact. Defendant's motion in limine to exclude Oscher's expert testimony is therefore DENIED.

*3. Conclusion*

Both Oscher and Morgenstern provide relevant and reliable testimony which may assist the trier of fact. Although Oscher has presented probative, if not persuasive, evidence regarding the existence of a Ponzi scheme, the Court finds that the challenged aspects of Oscher's analysis and opinion, as discussed in connection with the motion to strike his testimony, create a material issue of fact precluding summary judgment as to whether Mr. Waxenberg was operating a Ponzi scheme. The Receiver's motion for summary judgment on this issue is therefore DENIED.

### D. FUFTA Claims

The parties have also filed cross-motions for summary judgment on the substantive aspects of the Receiver's claims brought pursuant to Florida's Uniform Fraudulent Transfer Act ("FUFTA"), Fla. Stat. §§ 726.101, *et seq*. FUFTA provides a statutory scheme by which creditors may set aside a debtor's transfer of assets to third parties under certain circumstances. As this Court has previously determined, the Receivership LLCs (through the Receiver) are the "creditors," Mr. Waxenberg is the "debtor," and Mrs. Waxenberg is the third party transferee from whom the Receiver seeks to recover. (Dkt. 88 at 3). The Receiver has brought three claims against Mrs. Waxenberg pursuant to FUFTA, seeking to recover transfers categorized as "return of principal" (Count I), "false profits" (Count III), and "other transfers" purportedly for household and family expenses (Count V). Each claim is

brought pursuant to three subsections of FUFTA: Fla. Stat. § 726.105(1)(a), § 726.105(1)(b), and § 726.106(1), which include different elements of proof.

Section 726.105(1) of FUFTA provides two theories by which a present or future creditor may recover fraudulent transfers: an actual fraud theory, under subsection (a), and a constructive fraud theory, under subsection (b). Pursuant to this section:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>> 1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> 2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Fla. Stat. § 726.105(1).

The third basis for the Receiver's FUFTA claims, § 726.106(1), provides another constructive fraud theory, but is restricted to present creditors. This section allows present creditors to avoid transfers made by a debtor "without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Fla. Stat. § 726.106(1).

Finally, § 726.109(1) provides a "good faith defense" for transfers made with actual fraud under § 726.105(1)(a): "A transfer or obligation is not voidable under s. 726.105(1)(a) against a person who took in good faith and for a reasonably equivalent value or against any subsequent

transferee or obligee." Fla. Stat. § 726.109(1).

Mrs. Waxenberg has moved for summary judgment on two issues: (1) whether she took the transfers in "good faith" for the purposes of the good faith defense to the claims under § 726.105(1)(a); and (2) whether the transfers were for "reasonably equivalent value" for the purposes of the constructive fraud claims and good faith defense. The Receiver has moved for summary judgment as to the § 726.105(1)(a) actual fraud claims only, contending that Mrs. Waxenberg did not have the requisite good faith or give reasonably equivalent value to the Receivership Entities.[23]

*1.     Good faith*

Because "good faith" is an affirmative defense, Mrs. Waxenberg has the burden of demonstrating that she possessed good faith. Although FUFTA does not define "good faith," the courts apply an objective test. *Terry v. June*, 432 F. Supp. 2d 635, 641 (W.D. Va. 2006). The relevant question is whether the transferee had actual knowledge of the debtor's fraudulent purpose or "had knowledge of such facts or circumstances as would have induced an ordinarily prudent person to make inquiry, and which inquiry, if made with reasonable diligence, would have led to the discovery of the [transferor's] fraudulent purpose." *United States v. Romano*, 757 F. Supp. 1331, 1338 (M.D. Fla. 1989); *see also In re World Vision Entm't, Inc.*, 275 B.R. 641, 658 (Bankr. M.D. Fla. 2002). "[A] transferee may not remain willfully ignorant of facts which would cause it to be on notice of a debtor's fraudulent purpose." *In re World Vision Entm't, Inc.*, 275 B.R. at 659. Thus, the transferee's lack of actual knowledge of the debtor's fraudulent purpose is relevant to the good faith inquiry, but not dispositive. *Terry,* 432 F. Supp. 2d at 641.

---

[23] The Receiver's motion on these issues assumes the existence of a Ponzi scheme as a matter of law. (Dkt. 142 at 18). As that is an issue of fact, as discussed in Section C, *supra*, the Receiver's motion for summary judgment on the § 726.105(1)(a) claims must necessarily be denied.

Mrs. Waxenberg disclaims any actual or constructive knowledge. She believed at all times that Mr. Waxenberg's investment activities were legitimate and had no knowledge of Mr. Waxenberg's problems with the NASD until after this case was filed. According to her version of events, Mr. Waxenberg constantly studied literature about trading, periodically attended conferences on securities and trading, and wrote a newsletter on trading. Mr. Waxenberg would typically rise early to prepare for the opening of the markets. She observed him in contact with traders and clients, saw checks on his desk for substantial sums of money, and occasionally observed him preparing charts and graphs related to trading. Mr. Waxenberg explained to her that he was successful in futures and options trading because he was able to leverage the market and was disciplined in applying his investment strategies.

The Receiver, by contrast, argues that there were ample facts to put Mrs. Waxenberg on notice of the allegedly fraudulent nature of Mr. Waxenberg's business. First, the Receiver maintains that Mrs. Waxenberg is an educated, sophisticated business person, with experience in financial investments and extensive experience in real estate investments. (Dkt. 139, Exh. 1 at 23; Z. Waxenberg Dep. at 48-49).[24] Second, the Receiver notes that Mrs. Waxenberg's quarterly statements reflect "unreasonably high and steady" returns, with net annualized quarterly rates of return between 18% and 19.625%. (Oscher Dec., Exh. 7). Third, the Trust's contract with DATA possessed numerous spelling and grammatical errors. (Morello Dec., Exh. G). Fourth, Mrs. Waxenberg did not receive fund financial statements or other fund performance documents. (Dkt. 139, Exh. 1 at 25). Finally, the Receiver argues that Mrs. Waxenberg should have been on notice of Mr. Waxenberg's

---

[24] Mrs. Waxenberg contends that she has never done day trading and relied on the advice of investment professionals for her investments in stocks, bonds, mutual funds, and money market funds. (Z. Waxenberg Dep. at 86; Dkt. 139, Exh. 1, Att. A).

previous discipline from the NASD, which was public record, and the fact that he was not registered with the SEC as an investment advisor. Based on these facts, the Receiver contends that Mrs. Waxenberg should have conducted a further inquiry into Mr. Waxenberg's business, and her failure to do so eliminates her ability to invoke the good faith defense.

The Court finds that the parties' competing evidence on the subject of Mrs. Waxenberg's good faith presents a classic issue for the trier of fact. *See, e.g., Renta*, 530 F.3d at 1354. Accordingly, the parties' cross-motions for summary judgment on the issue of good faith are DENIED.

2. *Reasonably equivalent value*

The issue of whether a debtor received "reasonably equivalent value" for an allegedly fraudulent transfer is an element of both constructive fraud provisions in FUFTA, and is also an element of the good faith defense. FUFTA provides that:

> [v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person. Fla. Stat. § 726.104(1).

In assessing whether value was given, the totality of the circumstances are examined, including "the fair market value of the item or service received compared to the price paid, the arms-length nature of the transaction, and the good faith of the transferee." *In re Tower Envtl., Inc.*, 260 B.R. 213, 225 (Bankr. M.D. Fla. 1998) (citing *In re R.M.L., Inc.*, 92 F.3d 139, 150 (3d Cir. 1996)).

The Receiver moves for summary judgment as to whether Mrs. Waxenberg supplied reasonably equivalent value for the "false profits." Likewise, Mrs. Waxenberg moves for summary judgment as to whether she supplied reasonably equivalent value for the "return of principal." The

parties have also filed cross-motions on the issue of whether Mrs. Waxenberg supplied reasonably equivalent value for the "other transfers" for household and family expenses.

*a.     False profits*

With the respect to the claim for false profits, the Receiver contends that a transferee does not provide reasonably equivalent value for amounts received as profits in a Ponzi scheme, as a matter of law. *See Scholes*, 56 F.3d at 757. As set forth above, however, the Court has found that there are issues of fact regarding the existence of a Ponzi scheme. As such, it is premature to grant summary judgment on the Receiver's claim for false profits, and the Receiver's motion for summary judgment on Count III is therefore DENIED.

*b.     Return of principal*

Conversely, Mrs. Waxenberg contends that the transfers related to Mrs. Waxenberg's principal investment are for reasonably equivalent value, as a matter of law. *See In re Leneve*, 341 B.R. 53, 62 (Bankr. S.D. Fla. 2006). While the Receiver cites no case to the contrary to preclude summary judgment on the constructive fraud claims pursuant to Fla. Stat. § 726.105(1)(b) and § 726.106(1), he maintains that for the purposes of the actual fraud claims under § 726.105(1)(a) -- which do not involve the issue of reasonably equivalent value -- Mrs. Waxenberg cannot demonstrate good faith. As set forth above, the Court has found that an issue of fact exists regarding Mrs. Waxenberg's good faith, and Mrs. Waxenberg is therefore not entitled to summary judgment on the portion of Count I brought pursuant to § 726.105(1)(a). *See, e.g., Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008); *Scholes*, 56 F.3d at 757.

Mrs. Waxenberg is, however, entitled to summary judgment on the portion of Count I pursuant to Fla. Stat. § 726.105(1)(b) and § 726.106(1), and her motion is GRANTED IN PART to

this extent. *Id.*; *see also In re Terry Mfg. Co., Inc.*, No. 03-320663, 2008 WL 4493240, at \*7 (M.D. Ala. Sept. 30, 2008) (noting that good faith is irrelevant to constructive fraud claim to the extent reasonably equivalent value is provided).

c.    *Other transfers*

With respect to the "other transfers," the Receiver first argues that no Receivership Entity received value for the transfers pertaining to household and family expenses as the Receivership Entities had no obligation to support Mrs. Waxenberg and her sons. This argument is without merit. FUFTA asks whether the *debtor* -- not the creditor -- made the transfer or incurred the obligation . . . without receiving a reasonably equivalent value in exchange." Fla. Stat. § 726.105(1)(b); *see Goldberg v. Chong,* No. 07-20931, 2007 WL 2028792, at \*5 (S.D. Fla. July 11, 2007) (noting that the issue is "was any value received *by the debtor* in exchange for the transfer") (emphasis added). Accordingly, whether the Receivership LLCs -- which are creditors, not debtors -- received value is irrelevant to this analysis.

The majority view is that a debtor such as Mr. Waxenberg may receive reasonably equivalent value when he makes certain payments of household expenses to a spouse. *United States v. Goforth,* 465 F.3d 730, 736 (6th Cir. 2006) (construing similar federal provision). The Receiver contends, however, that Mrs. Waxenberg's average household expenses of $19,000.00 per month are exorbitant in comparison to amounts typically allowed by courts. For example, the earliest invoice provided by the parties shows expenditures of $14,687.28 for December 2002. (Dkt. 139, Exh. 8 at 6). Although Mrs. Waxenberg submits invoices from 2003 to 2005 (Dkt. 139, Exh. 8), neither party has discussed the expenses with sufficient specificity to warrant judgment as a matter of law on whether they were supported by reasonably equivalent value.

33

Mrs. Waxenberg also argues that Mr. Waxenberg made transfers to her for the rental of a condominium in Bradenton purchased by the Trust for the Waxenbergs' sons to live in while they attended a sports academy. (Z. Waxenberg Dep. I at 31; Dkt. 139, Exh. 5). Mrs. Waxenberg has not identified these transfers or their amount. Pursuant to the lease agreement between the Trust and DATA, the Trust charged $2000.00 per month in rent commencing July 1, 2002, which was later increased to $2300.00. (Dkt. 139, Exh. 5). Mrs. Waxenberg provides an affidavit from a Realtor, Wendy Leventhal, who avers that the fair market rent of a similar three bedroom, three bathroom unit was $3500.00 per month. (Dkt. 139, Exh. 7, Leventhal Aff., ¶ 15).[25] As a result, Mrs. Waxenberg contends that the unidentified transfers for rent were for reasonably equivalent value.

The Receiver argues that the rent paid was a sham, as Mr. Waxenberg had a home with Mrs. Waxenberg in California and leased separate office space in Bradenton. (Z. Waxenberg Dep. at 84). The Receiver has, however, provided no competing evidence regarding fair market value. To the extent the Receiver is arguing that the transfers were not at arms' length, or that Mrs. Waxenberg was not acting in good faith, these issues present jury questions. The parties' cross-motions on Count V are therefore DENIED. *See In re Chase & Sanborn Corp.*, 904 F.2d 588, 593 (11th Cir. 1990) (noting that whether fair consideration has been given for a transfer under bankruptcy fraudulent conveyance statute is "largely a question of fact.")

### E. Unjust Enrichment Claims

Finally, the parties have filed cross-motions for summary judgment on the Receiver's claims

---

[25] The Receiver has argued in a footnote that this affidavit should be stricken for failure to disclose Leventhal as a witness pursuant to Rule 26 of the Federal Rules of Civil Procedure. (Dkt. 147 at 17 n.6). The court will entertain a properly filed motion in limine to this effect. Notwithstanding consideration of Leventhal's affidavit, there is an issue of fact as to whether Mr. Waxenberg received reasonably equivalent value.

for unjust enrichment.[26]  In order to state a cause of action for unjust enrichment or "quasi contract" under Florida law, the Receiver must demonstrate that: (1) the Receivership LLCs conferred a benefit on Mrs. Waxenberg; (2) Mrs. Waxenberg had knowledge of the benefit; (3) Mrs. Waxenberg accepted or retained the benefit conferred; and (4) circumstances are such that it would be inequitable for Mrs. Waxenberg to retain the benefit without paying fair value for it. *Am. Safety Ins. Serv., Inc. v. Griggs*, 959 So. 2d 322, 331 (Fla. 5th DCA 2007).  In the instant motions, the parties dispute the application of the first prong -- whether the Receivership LLCs conferred a benefit on Mrs. Waxenberg -- and the fourth prong -- whether it would be inequitable for Mrs. Waxenberg to retain the benefit.

*1.    False profits*

The Receiver has moved for summary judgment on Count IV, which seeks return of Mrs. Waxenberg's "false profits."   Again, however, the Receiver's motion presupposes the existence of a Ponzi scheme.  (Dkt. 142 at 24).   As there are questions of fact as to this issue, the Receiver's motion for summary judgment on Count IV is DENIED.[27]

*2.    Return of principal*

With respect to the claim for return of principal, the Court finds that there are issues of fact as to whether a benefit was conferred and whether Mrs. Waxenberg paid fair value for it.  As this Court previously held in the March 26, 2008 Omnibus Order on the ancillary defendants' motions

---

[26] The Receiver moves for summary judgment on all unjust enrichment claims (Counts II, IV, and VI); and Mrs. Waxenberg moves for summary judgment on the claims for return of principal (Count II) and payment of household expenses (Count VI).

[27] As discussed in connection with standing in Section A, *supra*, there is no evidence that the Receivership LLCs directly conferred any benefit on Mrs. Waxenberg for the "false profits" transferred from DATA.  Therefore, the Receiver may only recover the transfer of "false profits" made by HWT under an unjust enrichment theory.

to dismiss:

> It is axiomatic that "[w]hen a defendant has given adequate consideration to someone for the benefit conferred, a claim of unjust enrichment fails." *Am. Safety Ins. Serv., Inc.*, 959 So. 2d at 331-332. In a typical, legitimate investment arrangement, it would be difficult to find that investors have been "benefitted" or "enriched" by a return of money equal to the amount they initially invested. The investors' original investment would furnish adequate consideration for the return of a corresponding amount and would leave the corporation no worse off than when it started.
>
> On the other hand, when the Defendants in these cases received payments, those payments are alleged to have dissipated the assets of the insolvent Receivership Entities. This allegation is not without facial merit, as the Receivership Entities are considered insolvent from their very inception by virtue of being used to perpetrate a Ponzi scheme. *See Scholes*, 56 F.3d at 755. Thus, any payment, whether characterized as principal or profits, injured the Receivership Entities. *But see Johnson v. Studholme*, 619 F. Supp. 1347, 1350 (D. Colo. 1985) (holding that Ponzi scheme fund was not "'injured' by payments that were essential to its existence"), *aff'd, Johnson v. Hendricks*, 933 F.2d 908 (10th Cir. 1987).
> (Dkt. 88 at 11).

There remain issues of fact regarding the existence of a Ponzi scheme and summary judgment on this issue is therefore not appropriate.

Moreover, as the cases relied upon by Mrs. Waxenberg indicate, her good faith is relevant to a consideration of the equities. *See Johnson*, 619 F. Supp. at 1350 (noting that "[t]he defendants accepted the money from the Fund in a *good faith* belief that the Fund was performing its contractual obligations") (emphasis added); *Chosnek v. Rolley*, 688 N.E.2d 202, 210 (Ind. App. 1997) ("an *innocent* investor in a Ponzi scheme is not unjustly enriched when he receives returns on his investment in good faith and while ignorant of the scheme") (emphasis added). Again, there is an issue of fact as to Mrs. Waxenberg's good faith.

Based on the foregoing, the parties' cross-motions for summary judgment on Count II are DENIED.

3.     *Other transfers*

With respect to the claims for "other transfers," the Court has already found issues of fact as to whether Mrs. Waxenberg provided fair value for the transfers and acted in good faith.[28]  The parties' cross-motions for summary judgment on Count VI are therefore DENIED.

### *Conclusion*

Upon consideration, it is **ORDERED AND ADJUDGED**:

1)     Defendant's Motion for Summary Judgment (Dkt. 139) is **GRANTED IN PART** as to: (a) the constructive fraud claims in Count I; and (b) the unjust enrichment claims in Counts IV and VI to the extent the Receiver seeks recovery of transfers made from accounts held in the name of DATA or Mr. Waxenberg.  In all other respects, the motion is **DENIED**.

2)     The Receiver's Motion for Summary Judgment (Dkt. 142) is **DENIED**.

3)     Defendant's Motion in Limine to Exclude the Expert Opinion Testimony and Report of Expert Witness Stephen S. Oscher and Oscher Consulting, P.A. (Dkt. 141) is **DENIED**.

4)     The Receiver's Motion to Strike the Expert Report and Testimony of Lloyd Morgenstern (Dkt. 143) is **DENIED**.

**DONE AND ORDERED** in chambers this ___19th___ day of March, 2009.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Counsel of Record

---

[28] As discussed in connection with standing in Section A, *supra*, there is no evidence that the Receivership LLCs directly conferred any benefit on Mrs. Waxenberg for a majority of the "other transfers," as they were made from Mr. Waxenberg's and DATA's accounts.  Therefore, the Receiver may only recover those transfers made directly by a Receivership LLC under an unjust enrichment theory.